UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| CALDWELL, WRIGHT ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| AVADIM HEALTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Caldwell, Wright Enterprises, Inc. ("CWE") hereby brings its complaint against Defendant, Avadim Health, Inc., formerly known as "Avadim Technologies, Inc. ("Avadim"), showing the Court the following:

## PARTIES

### 1.

CWE is a corporation formed under the laws of the State of Georgia.

### 2.

CWE's principal place of business is in the State of Georgia.

### 3.

Avadim is a corporation formed under the laws of the State of Delaware.

4.

Avadim maintains its principal place of business in Asheville, North Carolina (Buncombe County).

## **JURISDICTION & VENUE**

5.

There is complete diversity of citizenship between the parties to this dispute.

6.

The amount in dispute exceeds $75,000.

7.

This Court has jurisdiction over the subject matter of this dispute under 28 U.S.C. § 1332.

8.

For purposes of jurisdiction and venue, Avadim resides in Buncombe County, North Carolina.

9.

This Court has personal jurisdiction over Avadim because it resides within the Western District of North Carolina, Asheville Division.

10.

Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (2), because Avadim resides in the Western District of North Carolina and because a substantial

part of the events or omissions giving rise to CWE's claims occurred in the Western District of North Carolina.

## FACTUAL BACKGROUND

11.

Before August 24, 2015, CWE's name was "Athletes Advantage Sports Products, Inc."

12.

Avadim manufactures and sells topical solutions intended to promote personal hygiene and to treat a variety of skin and muscular conditions.

13.

In or about March 2014, Avadim and CWE entered into a distribution agreement, under which CWE marketed and sold certain products developed by Avadim.

14.

Through its efforts, CWE created a market for Avadim's products in the U.S. athletics, sports, and exercise markets.

15.

In or about July 2015, CWE and Avadim entered into a contract titled "Agreement of Purchase and Sale" (the "Purchase Agreement"). A copy of the executed Purchase Agreement (minus the Schedules) is attached hereto as Exhibit A.

16.

Under the Purchase Agreement, CWE sold its assets and operations to Avadim.

17.

As part of the consideration for CWE's assets and operations, Avadim agreed to pay CWE a royalty based on future sales of Avadim's products that meet certain contractually-defined criteria.

18.

Section 2.1(a) of the Purchase Agreement provides as follows:

Purchase Price. In consideration of the Acquisition Assets purchased herein and the confidentiality and non-competition agreements to be provided pursuant to Section. 5.1(d), [Avadim] shall pay [CWE] as follows (the "Purchase Price"):

a. Consideration Based on Future Revenues. [Avadim] agrees to pay [CWE] a portion of payments received by [Avadim] resulting from sales, licensing, private labeling, and/or distribution of its products specifically (1) intended for topical use and (2) marketed for use by athletes or in connection with athletics, sports, training or exercise (the "Innergy Products") to customers in the U.S.A., its territories and possessions, including the District of Columbia.

Provided, however, that products marketed specifically (1) to hunters, campers, and fisherman or (2) for use in hunting, camping, or fishing shall not be deemed Innergy Products. Such portion shall be 4% on such sales, licensing, private labeling and/or distribution occurring in the first five (5) years following the Closing and 2% on such sales, licensing, private labeling and/or distribution occurring in the next five (5) years following the Closing. [ . . . ]

19.

Section 2.2(a) of the Purchase Agreement provides that Avadim shall provide to CWE monthly reports supporting the payments to be made under Section 2.1(a):

[Avadim] shall submit to [CWE] monthly reports in reasonable detail of the payments due [CWE] under Section 2.1(a) within twenty (20) days of the last day of each calendar month during which consideration accrued hereunder to [CWE], along with such payment due for such month.

20.

Since the execution of the Purchase Agreement, Avadim has marketed and sold its topical solutions under a variety of registered and unregistered trademarks. These trademarks include, but are not limited to, "Theraworx," "Innergy," "pHUEL," and "Combat One."

21.

Although Avadim sells its topical solutions under various trademarks, the formula for each of these products is, essentially, the same.

22.

For the period from August 2015 through the present, Avadim has specifically marketed its products to athletes and in conjunction with athletics, sports, training or exercise.

23.

In particular, Avadim has specifically marketed its Theraworx-branded products to athletes and in conjunction with athletics and sports, including wrestlers and wrestling.

24.

For example, Avadim created and published the advertisement attached hereto as Exhibit B.

25.

Exhibit B includes a large picture of a scholastic wrestler and the following text:

> THERAWORX WRESTLING PURCHASING GUIDE
>
> Below is the recommended supply of Theraworx® for your wrestling
>
> program for the season. We have created two packages, Total Body

Protection and Upper Zone and Hand Protection, based on the level of coverage you would like to implement for your program.

26.

In October 2016, Avadim entered into an agreement with the National Wrestling Coaches Association (the "NWCA") to advertise and market Theraworx-branded products in conjunction with NWCA. The press release for that agreement is titled "National Wrestling Coaches Association (NWCA) Selects Theraworx® as its Infection Prevention Product Partner." It then quotes Avadim's National Director of Sales & Marketing as saying:

> Without question, this announcement and partnership will have dramatic impact and as we are demonstrating unprecedented outcomes in hospitals and ICU's across the country, we will accomplish the same in protecting wrestlers and athletes . . . . With respect to a collegiate and professional infection prevention landscape, we recognize the importance of having the wrestling community endorsement and adoption. This initiative will carry over and affect the other sports' infection prevention processes and protocols.

That press release is attached hereto as Exhibit C.

27.

Furthermore, Avadim specifically marketed Theraworx-branded products to athletes and in connection with athletics and sports at various NWCA activities. For example, in 2017 the NWCA hosted an amateur wrestling tournament that was called "the 2017 NWCA National Duals Championship Series presented by Theraworx and the United States Marine Corps."

28.

For the period from August 2015 through December 2017, Avadim made monthly royalty payments to CWE and provided reports relating to those payments.

29.

For the period from August 2015 through December 2016, Avadim did not pay CWE a royalty on any sales of its Theraworx-branded products.

30.

For the period of 2017, Avadim did report sales of some Theraworx products. However, Avadim reported only sales of "online Theraworx orders" in its monthly royalty reports to CWE and did not report any other Theraworx-branded product sales, such as direct sales or products sold to others for resale to consumers.

31.

For periods on and after January 2018, Avadim ceased providing any reports whatsoever with its monthly royalty payments to CWE.

32.

For the period from January 2018 to the present, Avadim has not paid CWE a royalty for sales of any of its Theraworx-branded products.

33.

Avadim's Theraworx-branded products are (1) intended for topical use and (2) marketed for use by athletes or in connection with athletics, sports, training, or exercise to customers in the U.S.A. Therefore, they are subject to a royalty under the terms of the Purchase Agreement.

34.

During the term of the Purchase Agreement, Avadim has sold products, other than its Theraworx-branded products, that are also subject to the royalty payments to CWE under the terms of the Purchase Agreement.

35.

Avadim has refused to pay CWE the royalty payments called for under the Purchase Agreement for sales of all of Avadim's products that are (1) intended for topical use and (2) marketed for use by athletes or in connection with athletics, sports, training, or exercise to customers in the U.S.A.

36.

Upon information and belief, Avadim has changed its marketing practices in a deliberate attempt to avoid paying CWE royalties that are owed under the Purchase Agreement.

37.

Section 9.6 of the Purchase Agreement provides that, in the event of litigation, the prevailing party shall be entitled to recover its attorney fees, costs, and expenses:

> 9.6 <u>Attorney Fees Provision</u>. In any litigation by which one Party seeks to enforce its rights under this Agreement or seeks a declaration of any rights or obligations under this Agreement, the prevailing party, as may be determined by the court, shall be entitled to an award of its reasonable attorney's fees, and costs and expenses incurred.

38.

CWE has satisfied all conditions precedent to recovery under the Purchase Agreement.

## Count I (Breach of Contract)

39.

CWE incorporates by reference the allegations made in Paragraphs 1 through 38 above.

40.

Avadim has breached its obligations under the Purchase Agreement.

41.

As a result of Avadim's breach of the Purchase Agreement, CWE has suffered monetary damages, in an amount not less than $75,000.

42.

CWE is entitled to recover damages in an amount to be determined at trial.

## Count II (Indemnification)

43.

CWE incorporates by reference the allegations made in Paragraphs 1 through 38 above.

44.

Under Sections 7.6(a) and 7.6(b) of the Purchase Agreement, Avadim agreed to indemnify CWE for any "claims, obligations, liabilities, damages, losses, costs and expenses whatsoever, including reasonable attorney's fees ('Damages')" that CWE sustains due to Avadim's "breach of the payment obligations under Section 2.1 or 2.2 [of the Purchase Agreement]."

45.

Avadim has breached the purchase obligations under Sections 2.1 and 2.2 of the Purchase Agreement.

46.

As a result of Avadim's breach of the Purchase Agreement, CWE has suffered damages in an amount not less than $75,000.

47.

CWE is entitled to be indemnified by Avadim for all damages caused by Avadim's breach, in an amount to be proven at trial.

**Count III (Declaratory Judgment)**

48.

CWE incorporates by reference the allegations made in Paragraphs 1 through 38 above.

49.

There exists between the parties an actual controversy regarding the parties' respective rights and obligations under the Agreement. In particular, there is a dispute between the parties over which sales of Avadim products are subject to a royalty payment to CWE under the terms of the Purchase Agreement.

50.

CWE is entitled to a declaratory judgment on the question of whether, under the terms of the Agreement, it is entitled to a royalty from Avadim for Avadim's sales of certain Avadim products, including (A) Avadim's Theraworx-branded products and (B) all other Avadim products that are (1) intended for topical use and

(2) marketed for use by athletes or in connection with athletics, sports, training, or exercise to customers in the U.S.A.

## Count IV (Specific Performance)

### 51.

CWE incorporates by reference the allegations made in Paragraphs 1 through 38 above.

### 52.

Avadim has breached the Purchase Agreement by failing to produce any royalty reports, as required by the Purchase Agreement, since December 2017.

### 53.

Avadim has breached the Purchase Agreement by failing to pay CWE a royalty for its sales of all products for which a royalty is owed under the terms of the Purchase Agreement.

### 54.

CWE is entitled to a judgment ordering Avadim to specifically perform under the Purchase Agreement by (1) producing monthly royalty payments and (2) paying CWE a royalty on its sales of all Avadim products that are subject to a royalty under the terms of the Purchase Agreement, including (A) Theraworx-branded products and (B) all other Avadim products that are (1) intended for topical use and (2)

marketed for use by athletes or in connection with athletics, sports, training, or exercise to customers in the U.S.A.

## Count V (Accounting)

### 55.

CWE incorporates by reference the allegations contained in Paragraphs 1 through 38 above.

### 56.

By failing to make payments to CWE under the terms of the Purchase Agreement, Avadim has breached legal and contractual duties it owes to CWE.

### 57.

It is impossible for CWE to know the amount of the payments that Avadim has wrongfully failed to make to CWE.

### 58.

CWE is without an adequate remedy at law.

### 59.

CWE is entitled to an accounting of Avadim's sales for which CWE is entitled to a payment under the Purchase Agreement.

## Count VI (Attorneys' Fees)

60.

CWE incorporates by reference the allegations contained in Paragraphs 1 to 59 above.

61.

Avadim's actions have forced CWE to seek relief in this complaint to enforce its rights under the Purchase Agreement.

62.

Under Section 9.6 of the Purchase Agreement, CWE is entitled to recover its reasonable attorneys' fees, costs, and expenses arising from and related to this litigation.

## **PRAYER FOR RELIEF**

WHEREFORE, CWE prays that the Court grant CWE the following:

1. A trial by jury on all claims and counterclaims;

2. A judgment in CWE's favor on all counts;

3. A declaratory judgment holding which sales of Avadim's products are subject to a royalty under the terms of the Purchase Agreement;

4. An accounting of Avadim's sales for which CWE is owed a payment under the terms of the Purchase Agreement;

5.     An order requiring Avadim to perform under the Purchase Agreement by issuing monthly reports of sales subject to a royalty containing sufficient details and facts concerning the products, quantities, and amounts such that the royalties thereupon can be confirmed by CWE and paying CWE a royalty on all sales of products that are subject to a royalty pursuant to the terms of the Purchase Agreement, including (A) all Theraworx-branded products and (B) all other Avadim products that are (1) intended for topical use and (2) marketed for use by athletes or in connection with athletics, sports, training, or exercise to customers in the U.S.A;

6.     An award of monetary damages, including compensatory damages, treble damages, punitive damages, attorneys' fees, costs, and expenses, in an amount to be determined at trial, but in any event not less than $75,000; and

7.     Any other relief that the Court deems just and proper.

This 11th day of October, 2018.

DEUTSCH & GOTTSCHALK, P.A.

s/ Robert J. Deutsch
Robert J. Deutsch (NC Bar #5577)
Tikkun A.S. Gottschalk (NC Bar #33945)
75 North Market Street
Asheville, NC 28801
Tel.: (828) 251-0600

Fax.: (828) 251-5508
bob@dglawpa.com
tikkun@dglawpa.com

FRIEND, HUDAK & HARRIS, LLP
Benjamin M. Byrd (Ga. Bar No. 141216)
(*pending Pro Hac Vice admission*)
Scott K. Harris (Ga. Bar No. 314538)
(*pending Pro Hac Vice admission*)
3 Ravinia Drive, Suite 1700
Atlanta, GA 30346
(770) 399-9500 (phone)
(770) 395-0000 (fax)
bbyrd@fh2.com
sharris@fh2.com

# **EXHIBIT A**

## **PURCHASE AGREEMENT**

## AGREEMENT OF PURCHASE AND SALE

This AGREEMENT (this "Agreement") dated as of July 21, 2015 (the "Effective Date"), is entered into by and between Avadim Technologies, Inc., a Wyoming corporation ("ATI"), and Athletes Advantage Sports Products, Inc., a Georgia corporation ("AA"). ATI together with AA shall collectively be referred to as the "Parties" and each individually as a "Party."

## RECITALS

A.  ATI and AA have heretofore entered into an Innergy Distribution Agreement dated March 1, 2014 (the "Distribution Agreement") under which AA became a distributor of Innergy products to the U.S. athletic market.

B.  AA desires to sell to ATI and ATI desires to purchase from AA the business being conducted by AA (the "Business") and substantially all of the tangible and intangible assets owned by AA and utilized in the conduct of the Business on the terms and conditions herein set forth (the "Acquisition").

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises hereinafter set forth, the Parties hereto agree as follows:

## ARTICLE 1
## PURCHASE OF ASSETS

1.1     Assets to be purchased. Subject to and upon the terms and conditions hereof and upon the basis of the representations and warranties contained herein, AA shall sell, transfer, assign, convey and deliver to ATI and ATI shall purchase and acquire from AA, at the Closing (as defined in Section 6.1), the Business of AA as a going concern, including the following assets of AA (the "Acquisition Assets"), free and clear of all liens and encumbrances:

a.     All equipment, furniture, consumable supplies, inventory telephone numbers and all tangible personal property owned by AA and used in the conduct of the Business, including such items as set forth on Schedule 1.1(a) hereto and incorporated herein.

b.     All trademarks, trade names, copyrights and registrations thereof owned by AA and used in the conduct of the business of AA, together with the goodwill of the Business symbolized thereby and the right to sue for past infringement thereof.

c.     All of AA's know-how, processes, trade secrets and other proprietary information and technology used in the Business, including, without limitation, all business plans, publications, customer and prospect lists, advertising and marketing programs, data, records, information, prospects, knowledge, procedures and other material relating to the Business or any service or product sold in connection with the Business.



d.     All records of AA relating to the conduct of the Business, including, without limitation, customer lists, contact lists, contact files and sales records.

e.     All rights and incidents of interest held by AA in software, computer programs, source codes and documentation used in the conduct of the Business to the extent that such rights may be legally transferred to ATI.

f.     All outstanding customer orders relating to the Business.

g.     All licenses, permits and tax certificates related to the Business to the extent they may be legally transferred.

h.     Except as specifically stated in Section 1.2 below, all other assets of AA used in the conduct of the Business and not specifically identified above.

1.2     Assets to be Retained. Notwithstanding anything to the contrary set forth in this Agreement, the Acquisition Assets will not include, and AA shall retain and shall not sell, transfer, assign, convey or deliver to ATI, the following assets, properties and rights of AA (collectively, the "Excluded Assets"):

a.     all cash on hand, and bank accounts and deposits;

b.     the organizational documents, the minute books, stock ledgers, tax returns, taxpayer identification numbers, financial books and records and employment records relating to AA;

c.     the rights that accrue to AA under this Agreement and any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by AA or ATI in connection with the transactions contemplated by this Agreement ("Ancillary Documents") (subject to the terms hereof and thereof, as applicable); and

d.     the assets listed in Schedule 1.2.

e.     the executory contracts, agreements or understandings of AA.

1.3     Obligations Not Assumed. In connection with the purchase of the Acquisition Assets, ATI shall not assume, pay and perform any obligations and liabilities of AA of any kind, nature or description whatsoever.

## ARTICLE II
## PAYMENT

2.1     Purchase Price. In consideration of the Acquisition Assets purchased herein and the confidentiality and non-competition agreements to be provided pursuant to Section 5.1(d), ATI shall pay AA as follows (the "Purchase Price"):

a.     Consideration Based on Future Revenues. ATI agrees to pay to AA a portion

of payments received by ATI resulting from sales, licensing, private labeling, and/or distribution of its products specifically (1) intended for topical use and (2) marketed for use by athletes or in connection with athletics, sports, training or exercise (the "Innergy Products") to customers in the U.S.A., its territories and possessions, including the District of Columbia. Provided, however, that products marketed specifically (1) to hunters, campers, and fisherman or (2) for use in hunting, camping, or fishing shall not be deemed Innergy Products. Such portion shall be 4% on such sales, licensing, private labeling and/or distribution occurring in the first five (5) years following the Closing and 2% on such sales, licensing, private labeling and/or distribution occurring in the next five (5) years following the Closing. Such consideration shall not be paid on shipping and mailing costs, taxes, insurance and related costs separately itemized on an invoice, or late fees and financing costs paid by the customer. ATI may charge back AA for consideration paid to AA on merchandise returned to ATI for credit or refund.

b.    Consideration in the Form of Equity. ATI shall issue to AA, on January 4, 2016, 100,000 fully-paid and non-assessable shares of ATI common stock (the "Shares") free and clear of all liens, encumbrances and restrictions other than as set forth in Section 2.3. Such shares shall be covered by the Registration Rights Agreement set forth in Schedule 2.1(b) and incorporated herein by reference.

2.2    Reports, Payments and Dispute Procedures.

a.    ATI shall submit to AA monthly reports in reasonable detail of the payments due AA under Section 2.1(a) within twenty (20) days of the last day of each calendar month during which consideration accrued hereunder to AA, along with such payment due for such month.

b.    ATI shall maintain complete and accurate books and records from which the information required in the monthly reports and from which the payments due under Section 2.1(a) can be determined. Such books and records shall be available for inspection and audit by AA during the normal business day upon ten (10) business days written notice to ATI given within fifteen (15) days following the receipt of each monthly report. AA shall have fifteen (15) days following the latter of (i) receipt of each monthly payment under Section 2.1(a) or (ii) the date after which it has received access to all books and records that it has reasonably requested from ATI to verify such payment, to notify ATI of any dispute the amount of such monthly payment. Such notice shall set forth in reasonable detail the basis for such dispute. If AA does not notify ATI of any dispute of the amount of such monthly payment within such fifteen (15) day period, the determination of such monthly payment (if any) as specified by ATI pursuant to Section 2.2(a) shall be deemed to be final and binding on the Parties. If AA does notify ATI of any dispute within such fifteen (15) day period, AA and ATI shall cooperate in good faith to resolve any dispute as promptly as possible, and upon such resolution, any change in such monthly payment shall be determined in accordance with such resolution and paid within ten (10) business days of such resolution. If AA and ATI are unable to resolve any dispute regarding any such payment within fifteen (15) days or such longer period as AA and ATI shall mutually agree in writing of the notice of such dispute, the dispute shall be resolved by an accounting firm mutually agreed upon by AA and ATI or, failing such agreement within thirty (30) days following notice of dispute by AA, then upon the written request of either AA

or ATI, such nationally recognized independent accounting firm selected by the International Institute for Conflict Prevention & Resolution ("CPR") in accordance with the CPR Non-Administered Arbitration Rules (such identified accounting firm, or if applicable, the other firm selected, the "Accountant"). Such Accountant shall be instructed to make a final determination of such payment based solely on the items that are in dispute and that, in resolving such items in dispute and in determining such payment, the Accountant shall not assign to any item in dispute a value that is (1) greater than the greatest value for such item assigned by ATI, on the one hand, or AA, on the other hand, at the time such matters were initially submitted to the Accountant or (2) less than the smallest value for such item assigned by ATI, on the one hand, or AA, on the other hand, at the time such matters were initially submitted to the Accountant. Such determination shall be final and binding on the Parties. The Accountant shall use commercially reasonable efforts to complete its work within thirty (30) days of its engagement. The fees, costs and expenses of the Accountant (A) shall be borne by ATI in the proportion that the aggregate dollar amount of all such disputed items so submitted that are unsuccessfully disputed by ATI (as finally determined by the Accountant) bears to the aggregate dollar amount of all such items referred to in clauses (A) and (B) of this sentence and (B) shall be borne by AA, in the proportion that the aggregate dollar amount of all such disputed items so submitted that are unsuccessfully disputed by AA (as finally determined by the Accountant) bears to the aggregate dollar amount of all such items referred to in clauses (A) and (B) of this sentence. (The proportions specified in clauses (A) and (B) of the preceding sentence shall equal exactly one, when added together.) Within ten (10) business days after the final determination of any disputed payment pursuant to this Section 2.2(b) such payment shall be made.

2.3    Securities Laws Matters. AA acknowledges and understands that, unless the Shares delivered to AA have been registered under the Securities Act of 1933 (the "Securities Act") pursuant to the Registration Rights Agreement set forth in Schedule 2.1(b), the Shares will not be registered under the Securities Act of 1933 (the "Securities Act") or any state Blue Sky Law (the "Laws") and that the Shares will be issued to AA without registration in reliance on Section 4(2) of the Securities Act and the appropriate provisions of the Laws, and the following representations and warranties of AA which ATI will rely on in agreeing to issue the Shares to AA:

a.    AA has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Shares and is able to bear such risks indefinitely.

b.    Prior to agreeing to acquire the Shares, ATI made available to the officers and directors of AA the opportunity to ask questions of, and to receive answers from AA concerning the business and operations of ATI and access to documents and other information relative to ATI and all such questions and requests for information have been answered to the full satisfaction of AA.

c.    AA acknowledges that ATI is an early stage of its development, that the business of ATI involves a high degree of risk and that no guarantees or representations have been made regarding the economic returns which may be expected from the Shares.

d.    AA is acquiring the Shares for its own account for investment purposes only and not with a view to or for the purpose of transfer, assignment, resale or distribution thereof, in whole or in part. AA will not sell or otherwise transfer or assign the Shares for a period of two (2) years from the date of issuance and thereafter (a) without registration under the Securities Act, or (b) without obtaining an opinion of counsel (which opinion shall be addressed to AAT and

is exempt from the registration requirements of the Securities Act and the Laws. The certificates representing the Shares will contain a legend referring to the restrictions on sale, transfer or assignment set forth in the preceding sentence and a stop transfer notice will be lodged against the Shares.

2.4     Market Hold-off.     In the event of any underwritten public offering of ATI's shares, AA will execute and comply with any market hold-off agreement required by the underwriters for a period not to exceed 180 days from the closing of any such public offering to the same extent that affiliates of ATI execute and comply with such market hold-off requirements. AA understands and acknowledges that ATI is under no obligation to prepare a registration statement for sale of its shares or include the Shares in any registration statement ATI may prepare in the future.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES

3.1     Representations and Warranties of AA.     AA hereby represents and warrants to ATI that each of the following statements is true and correct on the date hereof, and will be true and correct as of the Closing, except to the extent such representations and warranties specifically relate to the date hereof or other specified date.

a.     Organization.     AA is duly organized, validly existing and in good standing in and under the laws of the State of Georgia. AA has full power and authority to enter into this Agreement and to sell, transfer, assign and convey the Acquisition Assets to ATI.

b.     Authorization.     When duly executed by all Parties, this Agreement will be valid and legally binding upon AA and neither the execution of this Agreement by AA nor the performance by AA of the various terms and provisions hereof will violate AA's Articles of Incorporation or By-laws or any statute, indenture, loan agreement, contract or other instrument to which AA is a party or is bound. The Board of Directors and stockholders of AA have duly approved and consented to this Agreement and authorized the actions to be taken by AA in accordance with its terms.

        c.      Solvency.    The consummation of this Agreement will not render AA insolvent.

        d.      Sufficiency of Assets. The Acquisition Assets constitute all of the assets necessary and sufficient to conduct the operations of the Business in accordance with AA's past practices. AA has (and shall convey to ATI at the Closing) good and marketable title to the Acquisition Assets, free and clear of all liens and encumbrances.

        e.      Litigation. There is no suit, action, claim, arbitration, proceeding or investigation pending or, to the knowledge of AA, threatened against, relating to or involving AA, the Business or the Acquisition Assets, and, to the knowledge of AA, no basis exists for any such suit, action, claim, arbitration, proceeding or investigation.

        f.      No Changes. Except for AA's computer, since January 1, 2015, there has not been any change in the assets, liabilities, financial condition, or operations of AA, other than changes in the ordinary course of business, none of which individually or in the aggregate has had or is reasonably expected to have a material adverse effect on such assets, liabilities, financial condition or operations of AA.

        g.      Customers. AA will provide hard copies of all invoices AA has for 2014 and 2015 sales to customers. None of such customers has canceled or otherwise terminated, or advised AA of its intention to cancel or terminate or materially reduce its purchases from AA, refused to or threatened to refuse to pay its outstanding invoices, has demanded a refund or credit which AA believes to be unjustified or is known to be bankrupt or suspected of being insolvent.

    3.2    Representations and Warranties of ATI. ATI hereby represents and warrants to AA that each of the following statements is true and correct on the date hereof, and will be true and correct as of the Closing, except to the extent such representations and warranties specifically relate to the date hereof or other specified date.

        a.      Organization. ATI is duly organized, validly existing and in good standing under the laws of the State of Wyoming. ATI has full power and authority to enter into this Agreement and to purchase the Acquisition Assets and pay and perform its liabilities.

        b.      Authorization. When duly executed by all Parties, this Agreement will be valid and legally binding upon ATI and enforceable in accordance with its terms and neither the execution of this Agreement by ATI nor the performance by it of the various terms and provisions hereof will violate any statute, indenture, loan agreement, contract or other instrument to which it is a party or by which it is bound. The Board of Directors of ATI has duly approved and consented to this Agreement and authorized the actions to be taken by ATI in accordance with its terms.

        c.      Litigation. There is no suit, action, claim, arbitration, proceeding or investigation pending or, to the knowledge of ATI, threatened against, relating to or involving ATI or its business or assets, and, to the knowledge of ATI, no basis exists for any such suit, action, claim, arbitration, proceeding or investigation.

d.     Capitalization. The authorized capital of ATI consists of an unlimited number of shares of Common Stock of no par value. As of the date hereof the authorized and outstanding capital stock of ATI on a fully diluted basis (taking into consideration the exercise of any and all reserved shares, options, warrants, and any other rights to acquire securities of ATI) are as set forth on Schedule 3.2 (d). ATI's outstanding shares have been duly authorized and validly issued in compliance with applicable federal and state law, and are fully paid and non-assessable. The issuance of the Shares will not result in any anti-dilution adjustment or other similar adjustment to any outstanding shares of ATI's capital stock. No further approval or authorization of any shareholder, the Board of Directors or others is required for the issuance of the Shares. ATI is not a party to any shareholders agreements, voting agreements or other similar agreements with respect to its capital stock.

e.     Financial Statements. ATI's audited financial statements for the year ended December 31, 2014 are prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the period indicated, except as disclosed therein. ATI's unaudited financial statements for the three months ended March 31, 2015 are prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the period indicated, except as disclosed therein, subject to normal year-end adjustments and the absence of financial footnotes and present fairly the financial condition and position of ATI as of the respective dates and periods stated.

No other financial statements or tax returns of ATI or its predecessor which may have been delivered to AA shall be covered by the representations and warranties herein.

f.     No Changes. Since March 31, 2015, there has not been any change in the assets, liabilities, financial condition, or operations of ATI, other than changes in the ordinary course of business, none of which individually or in the aggregate has had or is reasonably expected to have a material adverse effect on such assets, liabilities, financial condition or operations of ATI.

g.     Intellectual Property. ATI has ownership of, valid licenses to use, or otherwise has the right to use all patents, patent rights, trademarks, rights, trade names, trade name rights, service marks, service mark rights, copyrights, technology, know-how, processes and other proprietary intellectual property rights and computer programs (collectively, the "Intellectual Property") used in its business. To ATI's best knowledge, the operation of its business does not infringe any Intellectual Property of others and, it has not received any notice from any third party of any such alleged infringement.

## ARTICLE IV
## PRE-CLOSING OBLIGATIONS

4.1     Conduct of Business. During the period from the date of this Agreement to the Closing, AA and ATI shall operate their respective businesses in the ordinary and usual course consistent with their prior practices, and shall not engage in any activity or enter into any transaction outside the ordinary and usual course of the Business.

4.2    Obtaining Consents. AA shall take all necessary action necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE V
## CONDITIONS TO CLOSE

5.1    Conditions to Obligation of ATI. The obligation of ATI to consummate the Acquisition shall be subject to the fulfillment at or before the Closing of the following conditions, any one or more of which may be waived in writing, in whole or in part, by ATI:

a.    Representations and Warranties. The representations and warranties of AA in Section 3.1 of this Agreement shall be true in all material respects on and as of the Closing with the same effect as though made on and as of such date and all agreements to be performed by AA on or before the Closing shall have been duly performed in all respects and ATI shall have been furnished with a certificate of an officer of AA, dated the Closing date, to that effect.

b.    Bills of Sale, Assignments, etc. AA shall have delivered to ATI a duly executed Assignment and Bill of Sale and such other instruments of transfer conveying and transferring the Acquisition Assets requiring consent to transfer to ATI as ATI may reasonably request.

c.    Title. ATI shall receive at the Closing legal title to the Acquisition Assets free and clear of all liens and encumbrances as of the Closing.

d.    Confidentiality and Non-Competition Agreements. AA shall have delivered to ATI duly executed confidentiality and non-competition agreements between ATI and AA and Julius A. Wright in the form annexed hereto as Exhibit 5.1. ATI may set-off against any payment due AA under Section 2.1(a) any losses and damages, including reasonable attorneys' fees and expenses incurred or suffered by ATI related to or arising out of any breach of the said confidentiality and non-compete agreements.

5.2    Conditions to Obligation of AA. The obligation of AA to consummate the Acquisition shall be subject to the fulfillment at or before the Closing of the following conditions, any one or more of which may be waived in writing, in whole or in part, by AA:

a.    Representations and Warranties. The representations and warranties of ATI in Section 3.2 of this Agreement shall be true in all material respects on and as of the Closing with the same effect as though made on and as of such date and all agreements to be performed by ATI on or before the Closing shall have been duly performed in all respects and AA shall have been furnished with a certificate of an officer of ATI, dated as of the Closing date, to that effect.

b.    Litigation. No material action, suit, or proceeding before any court or any governmental body or authority, challenging the transactions contemplated by this Agreement or to their consummation, will have been instituted on or before the Closing.

## ARTICLE VI

## CLOSING

6.1     Closing.        The purchase and sale of the Acquisition Assets shall take place remotely via the exchange of documents and signatures within three (3) business days of satisfaction of all of the conditions set forth in Sections 5.1 and 5.2 or at such other time as the Parties mutually agree upon, orally or in writing (which time and place are designated as the "Closing").

6.2     Delivery. At the Closing: ATI shall deliver to AA a certificate evidencing the Shares, duly issued and in form sufficient to vest title thereto fully in AA, free and clear of all liens other than restrictions on the resale or transfer of securities under state and federal securities Laws and a duly executed confidentiality and non-competition agreement between ATI and AA in the form annexed hereto as Exhibit 5.1. AA shall deliver to ATI the invoices identified in Section 3.1(g). AA shall delivery the inventory listed on Schedule 1.1(a) by personal delivery or by waybill evidencing the shipment of the inventory to ATI. All other physical assets will be transferred to ATI as instructed as soon as possible after the Closing.

## ARTICLE VII
## POST CLOSING RIGHTS AND OBLIGATIONS

7.1     Cooperation. After the Closing AA shall execute and deliver to ATI such applications, requests and other documents as may be reasonably requested by ATI in order to vest in ATI the full benefit of the Acquisition Assets. ATI shall execute and deliver such additional documents requested by AA which may be necessary or appropriate to carry out the transactions contemplated herein.

7.2     Name of Business. ATI shall have the right to use the name Athletes Advantage or a variation thereof in the conduct of the Business after the Closing and AA will change its corporate name to eliminate the words Athletes Advantage within ten (10) days after the Closing herein.

7.3     Allocation of Purchase Price. The Parties have agreed to allocate the Purchase Price among the Acquisition Assets and the non-compete agreements as set forth in Schedule 7.3 (the "Allocation Schedule") plus the amount of consideration paid by ATI to AA. After the Closing, AA and ATI shall file all information and tax returns (and any amendments thereto) in a manner consistent with this Section 7.3 and comply with the applicable information reporting requirements of Section 1060 of the Code and Treasury Regulations promulgated thereunder. If, contrary to the intent of the Parties hereto as expressed in this Section 7.3, any taxing authority makes or proposes an allocation different from that contained in this Section 7.3, AA and ATI shall cooperate with each other in good faith to contest such taxing authority's allocation (or proposed allocation), provided, however, that, after consultation with the Party adversely affected by such allocation (or proposed allocation), the other Party hereto may file such protective claims or returns as may reasonably be required to protect its interests.

7.4     Bulk Sales Compliance. The Parties have been informed of the bulk sale provisions of the Georgia Uniform Commercial Code and have agreed to waive compliance with same. In lieu of compliance with such provisions, AA has agreed to satisfy its indebtedness to all of its creditors as of the Closing and hereby agrees to indemnify and hold harmless ATI from any and all claims and

actions by creditors of AA seeking to assert rights under the bulk sales or fraudulent transfer provisions of applicable law.

7.5     Notice to Customers.  ATI may notify all customers of AA of ATI's purchase and intent to continue the operation of the Business and that all correspondence related to the Business should be directed to ATI.

7.6     Indemnities.

a.     Indemnity of ATI.  AA shall indemnify, defend and hold ATI harmless from and against (i) all claims, obligations, liabilities, damages, losses, costs and expenses whatsoever, including reasonable attorney's fees ("Damages") arising out of any material inaccuracy or omission of any material fact in any of the representations or warranties made by AA in Section 3.1 herein, or (ii) any and all third-party claims arising out of or related to the conduct of the Business prior to the Closing.

b.     Indemnity of AA.  ATI shall indemnify, defend and hold AA harmless from and against (i) all Damages arising out of (a) any material inaccuracy or omission of any material fact in any of the representations or warranties made by ATI in Section 3.2 herein or (b) any breach of the payment obligations under Sections 2.1 or 2.2, or (ii) any and all third-party claims arising out of or related to the conduct of the Business on or after the Closing.

c.     Limitation on Indemnity Claims.

(1)     Time Limitation.  Neither Party to this Agreement shall be entitled to make a claim against the other for any (i) Damages arising out of any inaccuracy or omission of any material fact in any of the representations or warranties given herein, or (ii) for any third-party claims arising out of or related to the conduct of the Business, except in either case with respect to claims as to which notice is given to the other Party on or before one (1) year following the Closing.  AA shall not be entitled to make a claim against ATI for any Damages arising out of ATI's breach of a payment due under Section 2.2 unless written notice of such claim is given within one (1) year of the date such payment is due under Section 2.2.

(2)     Certain Limitations on Indemnity Amount.  Neither Party shall make any claim for indemnification under this Article VII for Damages until the aggregate of such claims exceeds $5,000. Notwithstanding anything to the contrary in this Agreement, the total aggregate liability of AA shall not exceed the total amount of payments received by AA under Section 2.1(a) and 2.2(a).

d.     Claim Notice; Right to Defend.  A Party seeking indemnification (the "Indemnified Party") under this Section 7.6 shall promptly upon becoming aware of the facts indicating that a claim for indemnification may be warranted, give to the Party from whom the indemnification is being sought (the "Indemnifying Party") a claim notice relating to the Damages for which indemnification is sought (a "Indemnification Notice"). Each Indemnification Notice shall specify the nature of the claim, the applicable provision(s) of this Agreement under which the claim for indemnity arises, and, if possible, the amount or the estimated amount thereof. No failure or

delay in giving a Indemnification Notice (so long as the same is given prior to expiration of the representation or warranty upon which the claim is based) and no failure to include any specific information relating to the claim (such as the amount or estimated amount thereof) or any reference to any provision of this Agreement or other instrument under which the claim arises shall affect the obligation of the Indemnifying Party unless such failure results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the indemnifying Party with respect to such claim. If such the Damages relate to the commencement of any action or proceeding by a third person, the Indemnified Party shall give an Indemnification Notice to the Indemnifying Party regarding such action or proceeding and the Indemnifying Party shall be entitled to participate therein to assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party. After the delivery of notice from the Indemnifying Party to the Indemnified Party of its election to assume the defense of such action or proceeding, the Indemnifying Party shall not be liable (except to the extent the proviso to this sentence is applicable, in which event it will be so liable) to the Indemnified Party under this Section 7.6 for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof other than reasonable costs of investigation, provided that each Indemnified Party shall have the right to employ separate counsel to represent it and assume its defense (in which case, the Indemnifying Party shall not represent it) if (i) upon the advice of counsel, the representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them, (ii) in the event the Indemnifying Party has not assumed the defense thereof within 10 days of receipt of notice of such claim or commencement of action, and in which case the fees and expenses of one such separate counsel shall be paid by the Indemnifying Party (iii) such Indemnified Party who is a defendant in any action or proceeding which is also brought against the Indemnifying Party reasonably shall have concluded that there may be one or more legal defenses available to such Indemnified Party which are not available to the Indemnifying Party, or (iv) if such claim could result in criminal liability of, or equitable remedies against, the Indemnified Party. If any Indemnified Party employs separate counsel it will not enter into any settlement agreement, or compromise any audit, investigation, action or proceeding or consent to the entry of any judgment with respect to which indemnification is being sought hereunder, which is not approved by the Indemnifying Party, such approval not to be unreasonably withheld, unless (A) the Indemnifying Party fails to assume, or is not permitted to assume, and maintain the defense of such claim pursuant to the foregoing terms of this Section 7.6(d), or (B) such settlement, compromise or consent includes an unconditional release of the Indemnifying Party from all liability arising out of such claim. If the Indemnifying Party so assumes the defense thereof, it may not enter into any settlement agreement, or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder, without the prior written consent of the Indemnified Party, unless (x) such settlement, compromise, or consent includes an unconditional release of the Indemnified Party from all liability arising out of such claim, (y) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of the Indemnified Party and (z) does not contain any equitable order, judgment or term that in any manner affects, restrains or interferes with the business of the Indemnified Party. In any action hereunder as to which the Indemnifying Party has assumed the defense thereof with counsel reasonably satisfactory to the Indemnified Party, the Indemnified Party shall continue to be entitled to participate in the defense thereof, with counsel of its own choice, but, except as set forth above, the Indemnifying Party shall not be obligated hereunder to reimburse the Indemnified Party for the costs thereof.



e.     Exclusive Remedy. The Parties agree that, excluding (i) any claim for injunctive or other equitable relief or (ii) any breach of any representation, warranty, covenant or other provision of the confidentiality and noncompetition agreement entered into under Section 5.1, the indemnification provisions of this Section 7.6 are intended to provide the sole and exclusive remedy as to all claims either AA, on the one hand, or ATI, on the other hand, may incur arising from or relating to this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby.

7.7     Sales Promotion. ATI agrees to use commercially reasonable efforts to promote and fulfill demand for the Innergy Products in the U.S.A., its territories and possessions, including the District of Columbia, in light of prevailing market conditions and to the extent that the products are, at the relevant time, in the forefront of competitive products.

## ARTICLE VIII
## NOTICES

8.1     Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made as of the date delivered if delivered personally, three (3) days after being sent by registered or certified mail (postage prepaid, return receipt requested), one (1) day after dispatch by recognized overnight courier (provided delivery is confirmed by the carrier) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

To ATI:

Avadim Technologies, Inc.
81 Thompson Street
Asheville, NC 28801
Attn: David Fann, President


with a copy to:
(which shall not constitute
notice)

Joel Bernstein
2666 Tigertail Avenue
Suite 104
Miami, FL 33133

To AA:

Athletes Advantage Sports Products, Inc.
1070 Airport Industrial Park Drive
Marietta, GA 30060
Attn: Chip Wright

with copy to:
(which shall not constitute
notice)

Friend, Hudak & Harris, LLP
Three Ravinia Drive
Suite 1700
Atlanta, GA  30346-2117
Attn: Scott K. Harris

## ARTICLE IX
## MISCELLANEOUS

9.1     Public Announcements. ATI shall coordinate notices and public announcements of the transactions herein. No public announcement of the transactions provided for herein shall be made by AA unless the same shall be approved in advance in writing by ATI.

9.2     Expenses. Except as otherwise expressly provided herein, each of the Parties hereto shall pay its own fees and expenses incident to the negotiation, preparation, execution and consummation of this Agreement, including all fees and expenses of their respective counsel and accountants incurred in connection with this Agreement and all other agreements, documents, certificates, applications and other instruments prepared in connection herewith.

9.3. Successors and Assigns. Except as expressly provided in this Agreement, neither Party may assign, or otherwise transfer, or delegate, voluntarily, involuntarily, including by operation of law or otherwise, this Agreement or any of its rights or obligations under this Agreement without, in each instance, the prior written consent of the other Party. ATI may transfer all of its rights and obligations under this Agreement to an entity (a "Successor") which controls, is controlled by, or is under common control, directly or indirectly with it or to a third person as part of a sale, acquisition, merger, reorganization, or other transfer or assignment that involves substantially all of ATI's business or assets related to the Innergy Products provided such Successor shall assume the ATI's obligations under this Agreement by contract or operation of law. For all purposes under this Agreement, the term "ATI" shall mean any Successor which becomes bound by the terms of this Agreement by contract or operation of law. This Agreement shall inure to the benefit of and be binding upon AA and its respective successors and permitted assigns, and ATI and its respective successors and permitted assigns.

9.4     Resolution of Disputes. A Party to this Agreement believing that a claim or controversy has arisen from this Agreement (a "Dispute") must give a written notice specifying the nature of the Dispute, the applicable provision(s) of this Agreement under which the dispute arises, and, if possible, the amount or the estimated amount thereof (the "Notice of Dispute") to the other Party to the Agreement. Within the ten (10) business days after the receipt of such written Notice of Dispute, the Parties will attempt to settle such dispute through consultation and negotiation in good faith and a spirit of cooperation. Any Dispute which the Parties do not resolve within such ten (10) day period may then be submitted by any Party for litigation in accordance with Section 9.5.

9.5     Law to Apply; Venue. This Agreement shall be construed and enforced in accordance with the laws of the State of North Carolina, without reference to its conflicts of law principles. The Parties hereto agree that all actions or proceedings arising in connection with this Agreement shall be tried and litigated exclusively in the State and Federal courts located in the County of Buncombe, State of North Carolina. The aforementioned choice of venue is intended by the Parties to be mandatory and not permissive in nature, thereby precluding the possibility of litigation between the Parties with respect to or arising out of this Agreement in any jurisdiction other than that specified in this Section. Each Party hereby waives any right it may have to assert the

doctrine of forum non conveniens or similar doctrine or to object to venue with respect to any proceeding brought in accordance with this paragraph, and stipulates that the State and Federal courts located in the County of Buncombe, State of North Carolina shall have in personam jurisdiction and venue over each of them for the purpose of litigating any dispute, controversy, or proceeding arising out of or related to this Agreement. Each Party hereby authorizes and accepts service of process sufficient for personal jurisdiction in any action against it as contemplated by this Section by registered or certified mail, return receipt requested, postage prepaid, to its address for the giving of notices as set forth in this Agreement. Any final judgment rendered against a Party in any action or proceeding shall be conclusive as to the subject of such final judgment and may be enforced in other jurisdictions in any manner provided by law.

To the fullest extent permitted by law, and as separately bargained-for-consideration, each Party hereby waives any right to trial by jury in any action, suit, proceeding, or counterclaim of any kind arising out of or relating to this Agreement.

9.6 Attorney Fees Provision. In any litigation by which one Party seeks to enforce its rights under this Agreement or seeks a declaration of any rights or obligations under this Agreement, the prevailing party, as may be determined by the court, shall be entitled to an award of its reasonable attorney fees, and costs and expenses incurred.

9.7 Entire Agreement. This Agreement contains the entire agreement between the Parties hereto with respect to the subject matter hereof and supersedes any and all prior arrangements, proposals or understandings, written or oral, by or among any of the Parties hereto with respect to such purchase and sale or other transactions, including particularly the Distribution Agreement, which arrangements, proposals and understandings shall be of no further force and effect. No amendment or modification of this Agreement shall be effective for any purpose unless the same shall be in writing signed by all of the Parties hereto or their successors in interest. No Party has been induced to enter into this Agreement by, nor is any Party relying on, any representation, understanding, agreement, commitment or warranty outside those expressly set forth in this Agreement.

9.8 Counterparts. This Agreement may be executed in two or more counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement. A signed counterpart of this Agreement may be delivered by fax machine or electronic mail and shall be binding to the same extent as a counterpart with an original signature. Any Party who delivers such a signed counterpart agrees to later deliver an original signed counterpart to any Party which requests it.

9.9 Section Headings. The section headings herein are for convenience only and shall not affect the construction hereof.

9.10 No Brokers. Each Party represents to the other Party that no broker or finder has acted for it in connection with this Agreement, and agrees to indemnify and hold harmless the other Party against any fee, loss or expense arising out of claims by brokers or finders employed or alleged to have been employed by it.

9.11    Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by law, each Party hereby waives any provision of law that renders any such provision prohibited or unenforceable in any respect.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

Avadim Technologies, Inc.,
a Wyoming corporation

By: _____
David Fann, President

Athletes Advantage Sports Products, Inc.,
a Georgia corporation

By: _____
Julius A. Wright, President

**EXHIBIT B**

**THERAWORX'S ADVERTISEMENT FOR WRESTLING**



# Theraworx®
## T E C H N O L O G Y



### COMPROMISED SKIN

Apply Theraworx® Continuous Spray in and around damaged skin. Athletes should apply Theraworx® Continuous Spray liberally in and around damaged skin for 3 seconds, in a circular motion 6 inches from the perimeter **Safe for daily use.**

- Apply 3-4 times daily for up to 4 days
- Bandage or dressing allowable



### HAND PROTECTION

Apply (2) pumps of Theraworx® Foam from the wall mount or personal foamers. Rub vigorously into both hands and under fingernails until dry. **DO NOT RINSE.**



### NASAL SWABS

For Travel Application
1 hour before travel blow the nose to expel mucous. Insert one swab for each side of the nose and swirl in either direction for 5 seconds. Reapply 1 hour before return trip.

### THERAWORX WRESTLING PURCHASING GUIDE

Below is the recommended supply of Theraworx® for your wrestling program for the season. We have created two packages, Total Body Protection and Upper Zone and Hand Protection, based on the level of coverage you would like to implement for your program.

**Total Body Protection**

Season Long Supply Recommendation:
Continuous Spray Bottle
8 bottles / wrestler / season=
Approximately $70 per wrestler for the season
24 bottles per case

**Upper Zone + Hand Protection**

Season Long Supply Recommendation:
Continuous Spray Bottle
4 bottles / wrestler / season=
Approximately $35 per wrestler for the season
24 bottles per case

## TEAM PRICE ORDERING
1-877-677-2723

## MORE INFO
**Contact**
info@theraworx.com

**Visit**
www.theraworx.com





MADE IN
**USA**

# EXHIBIT C

## NWCA PARTNERSHIP PRESS RELEASE



# THIS IS AVADIM



Search Blog

TYPE HERE

## Recent Posts

Avadim Technologies Named to the Inc. 5000 List of Fastest-Growing Private Companies in America for the Third Consecutive Year

Avadim Technologies Added to General Services Administration (GSA), Federal Supply Services Contract for Theraworx® Protect and Combat One™

Avadim's Marketing Technology Investment Creates New Partnership

Avadim Technologies Announces Financing of $17 million

Avadim Technologies Receives Notices of Allowance from U.S. and Japan Patent Offices for Inventions

## Archives

August 2018
July 2018
May 2018
April 2018
November 2017
October 2017
September 2017
August 2017
June 2017
May 2017
April 2017
February 2017
January 2017
October 2016
September 2016
August 2016
July 2016
June 2016
May 2016

**06 OCT**   National Wrestling Coaches Association (NWCA) Selects Theraworx® as its Infection Prevention Product Partner

Written by Avadim Technologies   Categorized BLOG, News

Asheville, NC (October 6, 2016) – Avadim Technologies Inc. ("Avadim"), a life sciences company delivering Pathogenesis Based Therapies ("PBTs"), is pleased to announce that the NWCA has selected Theraworx® and its patented protocols as its infection prevention product partner. Previously, 2% and 4% Chlorhexidine Gluconate had been the associated partner for the previous 10 years.

NWCA Executive Director, Mike Moyer stated, "The NWCA has 350 collegiate and 8,500 high school wrestling program members. A specific goal we have for the 2016–'17 season is the complete elimination of skin infection. As one of the top three most reported injuries, skin infection is the only injury that is preventable. Studies have shown that 70% of infections are transmitted through skin-to-skin contact. The NWCA and its sports medicine advisors believe Theraworx® and its patented, optimized hygienic approaches are a perfect fit for our goals and mission in protecting our athletes. When looking at the track record of outcomes in hospitals as well as its safety, we are confident we have the right partner with Theraworx®!"

Justin Nofer, National Director of Sales & Marketing said, "In working with professional and collegiate teams at the highest level for the last twelve years, this may be the most important partnership that I've personally been associated with. Without question, this announcement and partnership will have dramatic impact and as we are demonstrating unprecedented outcomes in hospitals and ICU's across the country, we will accomplish the same in protecting wrestlers and athletes in the virulent environments they are in. We were extremely encouraged by the outcomes experienced with the Duke University wrestling team and now having the NWCA with its long-standing relationships and reach amongst more than 35,000 wrestling coaches we can have a profound impact nationally and worldwide. With respect to a collegiate and professional infection prevention landscape, we recognize the importance of having the wrestling community endorsement and adoption. This initiative will carry over and affect the other sports' infection prevention processes and protocols."

While originally formulated for clinical healthcare applications, the patented low pH formulation of Theraworx® offers an exciting new tool for athletic trainers, coaches and parents. Scientific evidence suggests maintaining and lowering the pH of the body's largest organ, the skin, optimizes the natural antimicrobial acidic mantle of the stratum corneum, the outer layer of the skin. This same low pH approach has also been shown to improve skin cohesion and integrity, and prevent trans-epidermal water loss.

**About National Wrestling Coaches Association (NWCA):**

The National Wrestling Coaches Association, established in 1928, is a non-profit organization for the advancement of all levels of the sport of wrestling with a primary emphasis on developing coaches who work in academic environments. The membership embraces all people interested in amateur wrestling. The three core competencies of the NWCA are: coaching development, student-athlete welfare, and the promotion of wrestling.

**About Avadim Technologies Inc.:**

Avadim Technologies Inc. is a life sciences company that has developed a new class of life sciences solutions based on Pathogenesis Based Therapies ("PBTs") which work to optimize the stratum corneum, integumentary functions and the associated reactive tissue. Our platform of therapies works to protect and support natural physiological functions of the outer barrier of the body, to super normalize it, supporting treatments within our three series of therapies for infection prevention, neuromuscular disorders and barrier repair. Our platform and technologies use a targeted topical delivery system, are non-toxic and are effective without the side effects of other remedy approaches. Initial acceptance in the U.S. clinical market of our first PBTs and our novel preventative approach, have shown both cost avoidance and superior effectiveness in addressing specific needs in healthcare. Avadim's advanced therapeutic class of Pathogenesis Based Therapies is capable of unlocking pathways to address emerging gaps in global health.

Avadim Technologies Inc. Contacts:

Joe McGuire, Chief Financial Officer

828.251.7111 Office

904.228.2603 Cell

joe.mcguire@avadimtechnologies.com

David Farri, President

828.251.7111 Office

904.251.4910 Cell

david.farri@avadimtechnologies.com

Avadim Technologies Inc.

81 Thompson Street

Asheville, NC 28803

www.avadimtechnologies.wpengine.com

Investor Relations:

Capital Markets Group, LLC

914.669.0175

info@CapMarketsGroup.com

www.CapMarketsGroup.com